**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| DARIAN AHLER, Derivatively on Behalf of Nominal Defendant REVANCE THERAPEUTICS, INC., | ) ) ) |
| | ) Case No. _____ |
| Plaintiff, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| MARK J. FOLEY, JILL BERAUD, VLAD CORIC, JULIAN S. GANGOLLI, CHRISTIAN W. NOLET, CAREY O'CONNOR KOLAJA, ANGUS C. RUSSELL, OLIVIA C. WARE, and TOBIN C. SCHILKE, | ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| REVANCE THERAPEUTICS, INC., | ) |
| | ) |
| Nominal Defendant. | ) |
| | ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Darian Ahler ("Plaintiff"), by and through his undersigned attorneys, brings this

verified stockholder derivative action on behalf of nominal defendant Revance Therapeutics, Inc.

("Revance" or the "Company"), against certain of the Company's executive officers and its

board of directors (the "Board") for breaches of fiduciary duties and violations of federal law

by the Individual Defendants (defined below). Plaintiff's allegations are based on personal

knowledge as to himself and his own acts, and upon information and belief as to all other

matters, based on, *inter alia*, the investigation conducted by his counsel, including review of

publicly available information regarding the Company; the allegations of a class action

complaint filed in the Securities Class Action captioned *Matney v. Revance Therapeutics, Inc. et al.,* Case No. 3:25-cv-00018-KNS (M.D. Tenn. Jan. 03, 2025); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Revance; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of Revance against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least February 29, 2024 and December 6, 2024, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      Revance is a biotechnology company that specializes in the development and manufacture of medical products with aesthetic and therapeutic applications. The Company designs products for use in the treatment of various conditions, including chronic migraine, facial aesthetics, and neuromuscular disorders.

3.      In January 2020, Revance entered into a distribution agreement with Teoxane SA ("Teoxane"), granting Revance, *inter alia*, "the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) the RHA® Collection of dermal fillers and (ii) the RHA® Pipeline Products in the U.S., U.S. territories and possessions, in exchange for 2,500,000 shares of [Revance] common stock" (the

"Distribution Agreement"). Pursuant to the Distribution Agreement, Revance was required to meet certain purchase obligations and certain minimum expenditure requirements.

4. Either party had the right to terminate the Distribution Agreement in the event of "a material breach by the other party, including certain specified breaches that include the right for Teoxane to terminate the [Distribution Agreement] for [Revance's] failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for [Revance's] breach of the exclusivity obligations" under the Distribution Agreement.

5. In August 2024, Revance announced that it had entered into a merger agreement (the "Merger Agreement") with Crown Laboratories, Inc. ("Crown"). Pursuant to the Merger Agreement, Crown would commence a tender offer (the "Tender Offer") to acquire all outstanding shares of the Company's common stock for $6.66 per share in cash, representing a total enterprise value of $924 million.

6. Throughout the Relevant Period, certain of the Company's officers and directors issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Revance was materially breaching the Distribution Agreement; (ii) as a result, the Company was at heightened risk of litigation; (iii) as a further result of the Company's breach of the Distribution Agreement, the Tender Offer was likely to be delayed and/or amended; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

7. On September 23, 2024, Revance disclosed that the Company "received a notice to remedy alleged material breaches, including breaches of the maximum levels of buffer stock and required efforts to promote and sell Teoxane products, under the [Distribution Agreement]."

8.     On this news, the price of Revance stock declined 7.66% in one day, from a close of $5.81 per share on September 20, 2024 to a close of $5.365 per share on September 23, 2024.

9.     Then, on December 9, 2024, Revance revealed that the Company and Crown had amended the Merger Agreement. Pursuant to the amended merger agreement, Crown would acquire all outstanding shares of Revance common stock for only $3.10 per share in cash, as opposed to $6.66 per share, as provided for in the initial Merger Agreement.

10.     On this news, the price of Revance stock declined 20.68%, from a close of $3.82 per share on December 6, 2024 to a close of $3.03 per share on December 9, 2024, the following trading day.

11.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

12.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Revance maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

18. Plaintiff is, and has been at all relevant times, a shareholder of Revance.

*Nominal Defendant*

19. Nominal Defendant Revance is incorporated under the laws of the State of Delaware.

20. The Company's principal executive offices are located at 1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203. Revance's common stock trades on the Nasdaq Global

5

Market ("NASDAQ") under the ticker symbol "RVNC."

*Individual Defendants*

21.     Defendant Mark J. Foley ("Foley") has served as the Company's Chief Executive Officer ("CEO") since October 2019 and as a member of the Board since 2017. Defendant Foley is named as a defendant in the Securities Class Action. As of March 8, 2024, Defendant Foley beneficially owned 2,033,869 shares of Revance stock, worth roughly $12.2 million[1] and constituting 1.9% of the Company's total outstanding shares of common stock.

22.     Defendant Jill Beraud ("Beraud") has served as a member of the Board since 2019 and serves as Chair of the Brand Strategy Committee and as Chair of the Compensation Committee. As of March 8, 2024, Defendant Beraud beneficially owned 82,828 shares of Revance stock, worth $497,796.

23.     Defendant Vlad Coric ("Coric") has served as a member of the Board since February 2023 and serves as a member of the Compensation Committee. As of March 8, 2024, Defendant Coric beneficially owned 15,346 shares of Revance stock, worth $92,229.

24.     Defendant Julian S. Gangolli ("Gangolli") has served as a member of the Board since 2016 and serves as a member of the Audit Committee and the Brand Strategy Committee. As of March 8, 2024, Defendant Gangolli beneficially owned 105,328 shares of Revance stock, worth $633,021.

25.     Defendant Christian W. Nolet ("Nolet") has served as a member of the Board since 2019 and serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. As of March 8, 2024, Defendant Nolet beneficially owned

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $6.01 per share closing price of Revance common stock on March 8, 2024.

82,828 shares of Revance stock, worth $497,796.

26.     Defendant Carey O'Connor Kolaja ("Kolaja") has served as a member of the Board since 2021 and serves as a member of the Audit Committee and the Brand Strategy Committee. As of March 8, 2024, Defendant Kolaja beneficially owned 43,417 shares of Revance stock, worth $260,936.

27.     Defendant Angus C. Russell ("Russell") has served as a member of the Board since 2014 and serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As of March 8, 2024, Defendant Russell beneficially owned 109,728 shares of Revance stock, worth $659,465.

28.     Defendant Olivia C. Ware ("Ware") has served as a member of the Board since 2021 and serves as a member of the Nominating and Corporate Governance Committee. As of March 8, 2024, Defendant Ware beneficially owned 45,775 shares of Revance stock, worth $275,108.

***Officer Defendant***

29.     Defendant Tobin C. Schilke ("Schilke") has served as the Company's Chief Financial Officer ("CFO") since November 2018. Defendant Schilke is named as a defendant in the Securities Class Action. As of March 8, 2024, Defendant Schilke beneficially owned 423,995 shares of Revance stock, worth roughly $2.5 million. During the Relevant Period, Defendant Schilke sold 9,361 shares of Company stock while in possession of material non-public information for proceeds of roughly $47,207. Specifically, while the price of Revance stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Schilke made the following sale of Company stock:

- On March 18, 2024, Defendant Schilke sold 9,361 shares of personal holdings of

Company stock at an average price of $5.04 per share, reaping $47,207 in proceeds.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

30.     Because of their positions as officers and/or directors of Revance, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Revance and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

31.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of Revance and its shareholders.

32.     Each director and officer of the Company owes to Revance and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Revance, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Revance, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Company.

35.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding, *inter alia*: (i) inventories of Revance's products; (ii) the Company's loss of market share to generics; and (iii) the sustainability of the Company's revenue growth during the COVID-19 pandemic, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.     To discharge their duties, the officers and directors of Revance were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Revance were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Revance's own Code of Ethic and Business Conduct (the "Code of Conduct");

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how Revance conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Revance and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Revance's operations would comply with all applicable laws and Revance's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

37.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Revance.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Revance and were at all times acting within the course and scope of such agency.

39.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

43.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Revance, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

45.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Revance and at all times acted within the course and scope of such agency.

## REVANCE'S CODE OF CONDUCT

46.     Revance's Code of Conduct begins with a commitment "to maintaining the highest standards of business conduct and ethics."

47.     The Code of Conduct applies to "every employee, officer and director of the Company," and violations of the Code of Conduct may lead to disciplinary action ranging "from a warning or reprimand up to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution."

48.     In a section titled "Honest and Ethical Conduct," the Code of Conduct states the following:

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with the Company, including all employees. Personal integrity is

the foundation of corporate integrity.

49.     In a section titled "Legal Compliance," the Code of Conduct states the following,

in pertinent part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect our employees to understand and comply with the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions for employees regarding relevant laws, rules and regulations, including laws prohibiting insider trading.
>
> * * *
>
> Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

50.     With respect to insider trading, the Code of Conduct states the following, in

pertinent part:

> Subject to the terms of the Company's Insider Trading and Trading Window Policy, employees who have access to confidential (or "inside" or "non-public") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. You must exercise the utmost care when handling material non-public information.

51.     In a section titled "Conflicts of Interest," the Code of Conduct stated the following,

in pertinent part:

> We respect the rights of our employees, officers and directors to manage their personal business affairs and investments. However, employees, officers and directors should avoid conflicts of interest that occur when their personal business interests may interfere in any way with the performance of their duties or the best interests of the Company.

52.     In a section titled "Maintenance of Corporate Books, Records, Documents and

Accounts; Financial Integrity; Public Reporting," the Code of Conduct states the following, in

pertinent part:

> The integrity of the Company's records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, the Company's corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

> * * *

> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the U.S. Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

> a) no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

> b) all employees must cooperate fully with requests from our accounting, finance and legal departments, as well as our independent public accountants, internal auditors and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

> c) no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to

omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

53.     With respect to Revance's corporate assets, the Code of Conduct states that '[a]ll employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our financial condition and results of operations."

## REVANCE'S AUDIT COMMITTEE CHARTER

54.     Pursuant to Revance's Audit Committee Charter, the purpose of the Audit Committee is to:

> [A]ct on behalf of the [Board] in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the independent registered public accounting firm or firms engaged as the Company's independent outside auditors engaged for the purpose of preparing or issuing an audit report or performing audit, review or other attest services (the "Auditors") and the performance of the Company's internal audit function.

55.     The Audit Committee Charter tasks the Audit Committee with the following responsibilities:

> ***Audited Financial Statement Review.*** To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend whether or not such financial statements should be so included.

> ***Annual Audit Results.*** To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative accounting treatments permissible under U.S. generally accepted accounting principles ("GAAP") on the financial statements), all misstatements identified during the audit (other than those the Auditors believe to not be material), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

15

* * *

***Quarterly Results.*** To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly unaudited financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

***Management's Discussion and Analysis.*** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

***Press Releases.*** To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson of the Committee may represent the entire Committee for purposes of this discussion.

***Accounting Principles and Policies.*** To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices or changes thereto, alternative accounting policies permissible under U.S. GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies, if, in the judgment of the Committee, such review is necessary or appropriate.

***Risk Assessment and Management.*** To review and discuss with management and, as appropriate, the Auditors, (i) the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures and (ii) the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, including those concerning data privacy, cybersecurity, backup of information systems, and ensuring compliance with the payment data security standards set forth by the Payment Card Industry Security Standards Council ("PCIDSS"). The Committee will consider the need to obtain specialized PCIDSS training in order to be effective in carrying out its duties under this section.

* * *

***Internal Control Over Financial Reporting; Disclosure Controls.*** To (i) confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies, significant changes in internal controls and the adequacy and effectiveness of the Company's information security policies and the internal controls regarding information security, including those concerning data privacy and cybersecurity and (ii) obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps taken in the event of material control deficiencies.

* * *

***Complaint Procedures.*** To establish and oversee procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing and ethical matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

* * *

***Ethical Compliance.*** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, to monitor compliance with the Company's Code of Business Conduct and Ethics (the "Code"), to investigate alleged violations of the Code, and to enforce the provisions of the Code.

## SUBSTANTIVE ALLEGATIONS

### Background

56.     Revance is a biotechnology company that specializes in the development and manufacture of medical products with aesthetic and therapeutic applications. The Company designs products for use in the treatment of various conditions, including chronic migraine, facial aesthetics, and neuromuscular disorders.

57.     The Company's product portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) and the RHA® Collection of dermal fillers, which are injections used to treat wrinkles.

58. In January 2020, Revance entered into a distribution agreement with Teoxane, granting Revance, *inter alia*, "the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) the RHA® Collection of dermal fillers and (ii) the RHA® Pipeline Products in the U.S., U.S. territories and possessions, in exchange for 2,500,000 shares of [Revance] common stock." Pursuant to the Distribution Agreement, Revance was required to meet certain purchase obligations and certain minimum expenditure requirements.

59. Either party had the right to terminate the Distribution Agreement in the event of "a material breach by the other party, including certain specified breaches that include the right for Teoxane to terminate the [Distribution Agreement] for [Revance's] failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for [Revance's] breach of the exclusivity obligations" under the Distribution Agreement.

60. In August 2024, Revance announced that it had entered into the Merger Agreement with Crown. Pursuant to the Merger Agreement, Crown would commence the Tender Offer to acquire all outstanding shares of the Company's common stock for $6.66 per share in cash, representing a total enterprise value of $924 million.

**The Individual Defendants False and Misleading Statements**

61. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Revance was materially breaching the Distribution Agreement; (ii) as a result, the Company was at heightened risk of litigation; (iii) as a further result of the Company's breach of the Distribution Agreement, the Tender Offer was likely to be delayed and/or amended; and (iv) as a result of the foregoing,

positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

62.     The Relevant Period begins on February 29, 2024, the day after the Company filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K") during after-market hours. The 2023 10-K was signed by Defendants Foley, Schilke, Russell, Beraud, Coric, Gangolli, Kolaja, Nolet, and Ware. With respect to the Company's strategy, the 2023 10-K stated the following:

- We have and will continue to selectively evaluate partnerships, distribution opportunities, joint development agreements and acquisitions to expand our aesthetic and therapeutic franchises and enhance our competitive position:

  o  Our Teoxane partnership enabled us to enter the U.S. dermal filler market and has provided the foundation for DAXXIFY® and potential future product commercialization.

63.     The 2023 10-K further stated the following regarding the Distribution Agreement:

Under the Teoxane Agreement, as amended in September 2020, November 2020 and December 2022, we are required to meet certain minimum purchase obligations during each year of the term and are required to meet certain minimum expenditure requirements in connection with commercialization efforts. Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

64.     On March 21, 2024, Revance filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Russell, Gangolli, and Ware to the Board and the compensation of certain of the Company's executive officers, including Defendants Foley and Schilke.

65.     While failing to disclose that the Company was in material breach of the Distribution Agreement, the 2024 Proxy touted the Company's partnership with Teoxane, stating

the following regarding Revance's "Performance Highlights":

> Teoxane SA received U.S. Food and Drug Administration ("FDA") approval for the expansion of RHA® 4's label to include cannula use in July 2023 and RHA® 3's label to include injection into the vermillion body, vermillion border and oral commissure for lip augmentation and lip fullness in adults aged 22 years and older in January 2024.

66. With respect to the Company's risk oversight function, the 2024 Proxy stated the following:

> We believe risk oversight is fundamental to our strategy to deliver sustainable, long-term value to our stockholders. While management is responsible for the day-to-day management of the material risks we face, our Board maintains ultimate responsibility for the oversight of risk. Our Board, along with its committees monitor and assess our risk exposure, including a determination of the nature and level of risk appropriate for the Company and ensuring risks are appropriately addressed and mitigated. The matrix below provides an overview of the key areas of risk oversight by our Board and committees. Our Audit, Brand Strategy, Compensation and Nominating and Corporate Governance committees are standing committees of the Board.

67. The 2024 Proxy further stated that the Audit Committee was responsible for "reviewing and discussing with management and, as appropriate, the independent auditor, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures."

68. On May 9, 2024, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2024 (the "1Q24 10-Q"), which stated the following regarding the Distribution Agreement:

> In January 2020, we entered into the Teoxane Agreement, as amended, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) RHA® Collection of dermal fillers, and (ii) the RHA® Pipeline Products in the U.S. and U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us. The Teoxane Agreement is effective for a term of ten years from product launch in September

2020 and may be extended for a two-year period upon the mutual agreement of the parties. We are required to meet certain minimum purchase obligations during each year of the term. Our minimum purchase obligation for the year ending December 31, 2024 is $52 million. Our minimum purchase obligations after December 31, 2024 will be determined based on projected market growth rate. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date.

Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

69. On August 8, 2024, the Company filed a quarterly report on Form 10-Q with the

SEC for the second fiscal quarter of 2024 (the "2Q24 10-Q"), which stated the following regarding

the Distribution Agreement:

In January 2020, we entered into the Teoxane Agreement, as amended, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) RHA® Collection of dermal fillers, and (ii) the RHA® Pipeline Products in the U.S. and U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us. The Teoxane Agreement is effective for a term of ten years from product launch in September 2020 and may be extended for a two-year period upon the mutual agreement of the parties. We are required to meet certain minimum purchase obligations during each year of the term. Our minimum purchase obligation for the year ending December 31, 2024 is $52 million. Our minimum purchase obligations after December 31, 2024 will be determined based on projected market growth rate. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date.

Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that

include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

70.     On August 12, 2024, the Company issued a press release, titled "Crown Laboratories and Revance Announce Entry Into Merger Agreement," which stated the following, in pertinent part:

Crown [. . .] and Revance [. . .] today announced that they have entered into a merger agreement pursuant to which the companies seek to merge the two complementary organizations.

***Under the terms of the agreement, which has been unanimously approved by Revance's Board of Directors, Crown will commence a tender offer to acquire all outstanding shares of Revance's common stock for $6.66 per share in cash***, representing a total enterprise value of $924 million. The purchase price represents a premium of 89% over Revance's closing market price on August 9, 2024, and a 111% premium to Revance's 60-day volume-weighted average price.

"This is a significant step forward in Crown's vision to become a fully integrated global aesthetics and skincare company, bringing innovative solutions to physicians, patients and consumers in the incredibly dynamic aesthetics and skincare market," said Jeff Bedard, founder and Chief Executive Officer of Crown. "Revance has an impressive track record in developing innovative aesthetics offerings that will complement Crown's innovative line of skincare products. As a combined company, we have the opportunity to create a comprehensive portfolio of high-growth products for all stages of life, and we will be committed to investing in education, training, and practice support for aesthetics providers across the United States."

Upon completion of the transaction, Crown Laboratories expects to be one of the leading global aesthetics and skincare companies in an attractive, high-growth market, with an industry-leading portfolio of 10+ cutting-edge skin health and aesthetic brands, and one of the largest distribution footprints in skincare across medical, retail and e-commerce channels.

[Defendant] Foley[] said, "Over the past several years, Revance has brought to the market innovative aesthetic and therapeutic offerings that have elevated patient and physician experiences. We are excited about this transaction and to be joining forces with Crown Laboratories, which will enable us to broaden our provider network as well as provide us with an expanded portfolio of products. We also believe that the merger provides substantial value for our stockholders. Crown shares our commitment to innovation and scale and will help us accelerate our

growth. Scale and product breadth are important factors in the markets in which we compete and, by combining with Crown, we will be able to offer our customers a more compelling range of products and services while, at the same time, benefiting from the combined strength of our collective commercial organizations."[2]

71.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Revance was materially breaching the Distribution Agreement; (ii) as a result, the Company was at heightened risk of litigation and substantial monetary and reputational damage; (iii) as a further result of the Company's breach of the Distribution Agreement, the Tender Offer was likely to be delayed and/or amended; (iv) despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk management contained in the 2024 Proxy, the Board and its committees were not adequately fulfilling these responsibilities; and (v) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times

***The Truth Emerges***

72.     On September 23, 2024, Revance filed a current report on Form 8-K with the SEC, which disclosed the following:

> **On August 16, 2024, Revance Therapeutics, Inc. (the "Company" or "Revance") received a notice to remedy alleged material breaches, including breaches of the maximum levels of buffer stock and required efforts to promote and sell Teoxane products, under the Company's exclusive distribution agreement with Teoxane SA ("Teoxane"), dated January 10, 2020, as amended (the "Distribution Agreement").** The Company denies the alleged material breaches asserted in the notice, does not believe that the asserted allegations constitute material breaches under the terms of the Distribution Agreement and intends to defend itself vigorously. The Company is engaged in discussions with Teoxane regarding the notification. These discussions could result in various outcomes, including but not limited to, the Company and Teoxane agreeing to modify certain terms of the

---

[2] Unless indicated otherwise, all emphasis is added.

Distribution Agreement, including the Company's minimum purchase obligations thereunder or the Company or Teoxane seeking remedies under the Distribution Agreement, including Teoxane seeking to terminate the Distribution Agreement. The Distribution Agreement continues to be in full force and effect.

***In light of these discussions, on September 19, 2024, Revance, Crown Laboratories, Inc. ("Crown") and Reba Merger Sub, Inc. ("Merger Sub," and together with Crown, the "Buyer Parties") agreed to extend the date by which Merger Sub is obligated to commence the tender offer for all of the outstanding shares of common stock of the Company (the "Offer") pursuant to the previously announced Agreement and Plan of Merger, dated as of August 11, 2024, by and among the Buyer Parties and the Company (the "Merger Agreement"), to October 4, 2024 or such other date as may be mutually agreed to between the Company and the Buyer Parties.*** The Company's ongoing discussions with Teoxane and the Buyer Parties could result in delays to the consummation of the Offer or in the Company or the Buyer Parties seeking remedies in accordance with the terms of the Merger Agreement.

73.     On this news, the price of Revance stock declined 7.66% in one day, from a close of $5.81 per share on September 20, 2024 to a close of $5.365 per share on September 23, 2024.

74.     Then, on December 9, 2024, Revance filed another current report on Form 8-K with the SEC, revealing that the Company had entered into an amended merger agreement with Crown, pursuant to which Crown would acquire all outstanding shares of Revance common stock for only $3.10 per share in cash, as opposed to $6.66 per share, as provided for in the initial Merger Agreement. In pertinent part, the Form 8-K stated:

On December 7, 2024, Crown Laboratories, Inc., a Delaware corporation ("Parent"), Reba Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub," and together with Parent, the "Buyer Parties"), and Revance Therapeutics, Inc., a Delaware corporation ("Revance" or the "Company"), entered into an Amended and Restated Agreement and Plan of Merger (the "A&R Merger Agreement"), pursuant to which Parent will cause Merger Sub to commence a tender offer (as it may be amended from time to time as permitted by the A&R Merger Agreement, the "Offer") on December 12, 2024 to purchase all of the outstanding shares of common stock, par value $0.001 per share, of the Company (the "Company Common Stock," each a "Share" and collectively, the "Shares") at a price of ***$3.10 per Share*** (such amount per Share, the "Offer Price"), in cash, without interest. As soon as practicable following the consummation of the Offer, on the terms and subject to the conditions set forth in the A&R Merger Agreement, Merger Sub will be merged with and into the

Company (the "Merger"), with the Company surviving as a wholly owned subsidiary of Parent. The A&R Merger Agreement amends and restates the Agreement and Plan of Merger (the "Original Agreement"), dated as of August 11, 2024, by and among the Company and the Buyer Parties.

75.     Analysts quickly responded to the news, with *Reuters* publishing an article on the same day titled "Revance agrees to lower take-private offer by Crown Labs." The *Reuters* article stated the following, in pertinent part:

> Crown Laboratories would buy the anti-wrinkle injection maker Revance Therapeutics[], opens new tab at a roughly 50% lower price compared to an original agreement signed in August, the companies said on Monday, sending the latter's stock tumbling 20%.

> The lowered takeover price follows months of delay in the deal after Revance, which makes a rival to AbbVie's (ABBV.N), opens new tab blockbuster product Botox, faced a dispute with its partner Teoxane.

> As per the current agreement, Crown will buy all of Revance's outstanding shares for $3.10 per share, or $325.20 million according to Reuters' calculations. The previous agreement was for $6.66 per share or $924 million.

> Revance received a notice in September for breaching the maximum allowed buffer stock levels and not adequately promoting and selling Teoxane's dermal fillers, as required by their distribution agreement.

* * *

> **"This significant devaluation is a reflection of multiple forced errors, starting with the failed launch strategy for Daxxify and ensuing reputational damage to Revance's relationships to the surprise merger announcement near all-time lows, then leading to accusations of breach of contract with Teoxane,"** said Stifel analyst Annabel Samimy.

76.     On this news, the price of Revance stock declined 20.68%, from a close of $3.82 per share on December 6, 2024 to a close of $3.03 per share on December 9, 2024, the following trading day.

### Insider Sales

77.     During the Relevant Period, Defendant Schilke made unusually timed sales of

Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

78.    Defendant Schilke sold personal holdings of Company stock at an average price of $5.04 per share, approximately 166% of the stock's closing price of $3.03 after the corrective disclosures on December 9, 2024.

## <u>DAMAGE TO THE COMPANY</u>

79.    As a direct and proximate result of the Individual Defendants' misconduct, Revance has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

80.    Such expenditures include, but are not limited to, legal fees associated with defending against the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

81.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal controls and its risk oversight function.

82.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

83.    As a direct and proximate result of the Individual Defendants' actions, Revance has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

85.     Revance is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

86.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

87.     Plaintiff is an owner of Revance stock and has been a continuous holder of the Company's common shares at all relevant times.

88.     At the time this action was commenced, the eight-member Board was comprised of Defendants Russell, Nolet, Beraud, Coric, Foley, Gangolli, O'Connor, and Ware. Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

89.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

90.     The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

91.     As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Revance, the Individual Defendants knew, or should have known, the material facts surrounding the Company's noncompliance with the terms set forth in the Distribution Agreement.

92.     Defendant Foley is not disinterested or independent and is therefore incapable of considering a demand. Defendant Foley has served as the Company's CEO since 2019. Thus the Company admits that Defendant Foley is a non-independent director.

93.     Furthermore, Defendant Foley is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

94.     Defendants O'Connor, Gangolli, and Nolet serve as members of the Audit

Committee and, pursuant to the Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's noncompliance with the terms set forth in the Distirbution Agreement and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants O'Connor, Gangolli, and Nolet cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

95. Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Revance stock and stock options they held.

96. The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Revance's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood

of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

97.     Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy, "pursuant to which the Company may recoup certain compensation from the Company's executive officers in the event of fraud or willful misconduct."

98.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

99.     The acts complained of herein constitute violations of fiduciary duties owed by Revance's officers and directors, and these acts are incapable of ratification.

100.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, *i.e.*, monies belonging to the stockholders of Revance. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Revance, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

101. If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Revance to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

102. Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the Individual Defendants for Violations of § 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

31

105.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's goodwill and its internal controls over financial reporting.

106.    The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants Russell, Gangolli, and Ware to serve for another three-year term on the Company's Board. In addition, the 2024 Proxy was also used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Foley and Schilke. While the shareholder vote was non-binding, the 2024 Proxy indicated that "the views expressed by our stockholders . . . are important to management and the Board and, accordingly, the Compensation Committee and Board intend to consider the results of this vote in making determinations in the future regarding executive compensation arrangements."

107.    With respect to the Company's executive compensation, the 2024 Proxy indicates that compensation is performance-based, stating that one of the "overall objectives of our executive compensation policies and programs" is to "link pay to Company performance."

108.    The materially false and misleading statements contained in the 2024 Proxy regarding the Distribution Agreement and the adequacy of the Company's risk oversight function therefore misleadingly induced shareholders to vote in favor of the election of Defendants Russell, Gangolli, and Ware, and performance-based compensation to Defendants Foley and Schilke, to which they were not entitled.

109.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

**COUNT II**

**Against the Individual Defendants for
Breach of Fiduciary Duties**

110.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

112.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

113.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock,

resulting in an increased cost of capital, and reputational harm.

115.    Plaintiff, on behalf of Revance, has no adequate remedy at law.

## COUNT III

**Against Defendant Schilke**
**For Breach of Fiduciary Duties (*Brophy* Claim)**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    During the Relevant Period, Defendant Schilke held a position within the Company that provided him access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding his duty to refrain from trading in Revance common stock under the circumstances, Defendant Schilke sold his holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

118.    The insider sales detailed herein, were not part of any regular pattern of sales for Defendant Schilke and were suspicious in terms of timing and amount.

119.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendant Schilke misappropriated to his own benefit when he sold Revance stock. At the time of his stock sales, Defendant Schilke was aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. Defendant Schilke's sales of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

120.    Plaintiff, on behalf of Revance, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

123.    Plaintiff, on behalf of Revance, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for
### Unjust Enrichment

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Revance.

126.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Revance that was tied to their performance or to the artificially inflated valuation of Revance.

127.    Defendant Schilke was further unjustly enriched with respect to insider sales of Company stock.

128.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

129.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

130.     Plaintiff, on behalf of Revance, has no adequate remedy at law.

### COUNT VI

**Against the Individual Defendants
for Waste of Corporate Assets**

131.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Revance's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

133.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

134.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

135.     Plaintiff on behalf Revance has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 6, 2025

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**LOCAL COUNSEL**

*s/* Wade B. Cowan
Wade B. Cowan (SC#9403)
**WADE B. COWAN, ATTORNEY AT LAW**
P.O. Box 50617
Nashville, TN 37205
Telephone: (615) 390-6652
Email: wcowan@dhhrplc.com

*Attorneys for Plaintiff*

37

Docusign Envelope ID: 9341D4DF-D152-43DD-AF52-D248E9682075

## <u>VERIFICATION</u>

I, Darian Ahler, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 __ day of January 2025.

Darian Ahler